EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
JOHN R. VANCE, JR., State Bar No. 51744
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 703-5864
 Fax:  (415) 703-1234
 Email:  John.Vance@doj.ca.gov
Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **CALVIN P. ROGERS,** | C 07-4658 CRB (PR) |
| Petitioner, | |
| **v.** | |
| **M.S. EVANS, Warden,** | |
| Respondent. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ANSWER TO ORDER TO SHOW CAUSE**

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JOHN R. VANCE, JR., State Bar No. 51744
   Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
7  Telephone:  (415) 703-5864
   Fax:  (415) 703-1234
8  Email:  John.Vance@doj.ca.gov
   Attorneys for Respondent
9
                  IN THE UNITED STATES DISTRICT COURT
10
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12  **CALVIN P. ROGERS,**                    C 07-4658 CRB (PR)

13                          Petitioner,      **MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT OF**
14                    **v.**                     **ANSWER TO ORDER TO SHOW
                                             CAUSE**
15  **M.S. EVANS, Warden,**

16                          Respondent.

17

18                          **STATEMENT OF THE CASE**

19         By an information filed June 10, 2004, the Santa Clara County District Attorney charged

20  petitioner with two counts of second-degree robbery (Cal.Pen. Code, §§ 211/212.5), alleging two

21  strike priors (Cal.Pen. Code, §§ 667(b)-(I) & 1170.12), two serious felony priors (Cal.Pen. Code,

22  § 667, subd. (a)), one prior conviction for a violent felony (Cal.Pen. Code, § 667.5, subd. (a)), and

23  five prior prison terms.  Cal.Pen. Code, § 667.5, subd. (b).  Exh. A, CT 84-90.

24         On October 19, 2004, petitioner waived jury trial.  Exh. A, CT 222-224.

25         On December 2, 2004, the court found petitioner guilty of both counts and found all priors

26  true.  Exh. A, CT 240-246, 251-254.

27         On April 7, 2005, the  court sentenced petitioner to two consecutive 25 years to life terms

28  under the Three Strikes Law.  Exh. A, CT 324-325.

1    On September 21, 2006, the state court of appeal affirmed petitioner's convictions. Exh.

2    C.

3    On January 3, 2007, the state supreme court denied review. Exh. D.

4    On or about September 10, 2007, petitioner filed the instant petition.

5    On January 11, 2008, this Court issued an order to show cause.

6    **STATEMENT OF FACTS**

7    We take the statement of facts from the decision of the state appellate court:

8    That summary is presumed accurate. *Hernandez v. Small*, 282 F.3d 1132, 1135, n. 1 (9th Cir.

9    2002).[1]

10   Background
     Defendant was charged with two robberies: one on April 10, 2004, in Milpitas, and

11   the other a week later in Sunnyvale. The prosecution was also permitted to present
     evidence of five other robberies, all committed in Alameda County, on the basis that the

12   manner and circumstances of their commission so resembled the charged offenses that the
     uncharged robberies were admissible to prove the identity of the perpetrator of the

13   charged offenses. We will therefore recite the evidence concerning all seven robberies,
     along with other relevant facts, in chronological sequence.

14

15   On November 12, 1999, a customer emerged from a Bank of America in Dublin,
     where she had just made a deposit. On her way to her car she saw defendant talking on

16   the phone. As she sat in her car talking on a cellphone, she saw another customer, a young
     woman, approaching the bank with a deposit pouch in her hands. The first customer

17   looked down, and when she looked back up she saw defendant running with the deposit
     pouch in his hands. She followed him in her car as he entered a car and attempted to drive

18   away. While he waited for traffic to clear, she called 911 and read defendant's license
     number to authorities. She identified him in a subsequent photographic lineup. At the

19   instant trial she again identified him as the robber. Defendant was convicted of robbery
     in connection with those events.

20   On February 17, 2004, Carolyn Vane was robbed at a Bank of America branch in
     Castro Valley. She had driven to the bank in late morning to make a deposit for her

21   employer, a pet supply store. She was carrying two Bank of America deposit pouches, one
     gray and one navy blue, both with ""Bank of America"" on them. They contained over

22   $3,000 in cash and a larger sum in checks. She parked her car in the bank's parking lot
     and approached the entrance. A man ahead of her stopped at the door, as if to open it for

23   her. Instead he turned, grabbed her, wrested the deposit bags from her grip, and ran across
     the street into the parking lot of a nearby parking mall. She followed, screaming ""stop,

24   thief"" at the top of her lungs. He was African American, around six feet tall, over 200
     pounds, and broad shouldered. A Department of Motor Vehicles printout admitted into

25   evidence without objection stated that defendant is 5 feet 11 inches tall, weighs 220
     pounds, and was born on September 6, 1964, making him 39 years old at the time of this

26   robbery. Ms. Vane identified defendant as the robber at the preliminary hearing and at
     trial. She had failed to select anyone from a photographic lineup about two months after

27   _____

28   1.  We attach our Respondent's Brief which has record citations as Exhibit F.

the robbery, but she testified that defendant's photograph was not a good likeness.

On March 5, 2004, shortly after 1:00 p.m., Catherine Travis was robbed at a Bank of America branch on Mission Boulevard in Hayward, where she had gone on behalf of her employer, a cemetery, to deposit over $40,000, of which $3,000 to $4,000 was cash. She carried the money in a zippered Bank of America deposit bag, dark blue with the bank logo in red on the front. As she got out of her car she noticed a man who seemed to be approaching the bank from a nearby drugstore. When she got about 10 feet from the bank, she heard somebody running behind her. Before she had a chance to turn around, the man she had seen came in front of her, grabbed the bag from under her left arm, and ran away. She ran after him and got a further look at him, coming within three feet when he dropped his cell phone. He was black. She described his height as ""probably about five-six, five-seven, five-eight."" She is five-two, and acknowledged that the robber was taller than she. She could not estimate his weight. She identified defendant as the robber at the preliminary hearing and at trial.

Shortly after 9:20 a.m. on March 12, 2004, Suman Goyal was robbed at a Bank of America Branch on Decoto Road in Union City while attempting to deposit about $12,000 in cash from her family's gas station. She was carrying the cash in a white cloth bag provided by the bank. As she tried to open the door into the bank, somebody came up behind her and snatched the bag from her hands. The robber was black, 30-40 years of age, maybe six feet tall, with a heavy build. She estimated his weight at 150-160, but then said it was ""maybe more than that"" and affirmed that the robber ""was a heavy built person."" She described him as ""bald headed, no hair on head, and chubby face."" After he snatched the bag away, she screamed and screamed. She tried to follow him, but he ran completely out of the parking lot and across the street, at which she stopped.

At the same time, Jason Mandawe was driving to work when he heard a woman screaming in the vicinity of a bank on Decoto Road. He saw a man run across the street, stop at the median island, then continue across the street. He described the man as a light-skinned African American, although he might have told police he was Puerto Rican. The witness turned into a parking lot on the chance that he might ""see someone run into a car."" After driving a short distance he saw a man resembling the one he saw crossing the street, driving a small sports car that looked like an RX7 but wasn't. He thought he told police it ""looked like a Miata, a RX7."" It was a dark green 2-door with a tan top, perhaps a convertible. It had no front plate, but the witness succeeded in getting the first four digits from the rear plate: ""4XCX."" He followed the car trying to get the rest of the number, but the suspect soon eluded him. Defendant's wife owned a green Mazda Miata with license 4XCX388.[FN1]

FN1. On November 24, 2003, defendant received a traffic ticket while driving a green two-door Mazda with license number 4XCX388. Called and examined by the prosecution, defendant's wife testified, among other things, that she had owned a green 1999 Mazda Miata. Later the prosecutor asked the court to strike all of her testimony on the ground that it had been improperly elicited because the witness had not been given an opportunity to exercise her privilege not to testify against her husband. (Evid.Code, §§ 970.) The court granted the request, but we note that defense counsel also subpoenaed Ms. Rogers with the intention of having her establish an alibi testimony for defendant. After her examination by the prosecution, defense counsel in fact made her his witness and examined her toward that end. By its terms the statute did not entitle her to refuse to testify *in her husband's favor.* (Evid.Code, §§ 970, italics added [married person ""has a privilege not to testify *against his spouse* in any proceeding""]; see 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, §§ 176, p. 447.) Once she did so, the privilege not to testify dropped away entirely.

(Evid.Code, §§ 973, subd. (a) [""Unless erroneously compelled to do so, a married person who testifies in a proceeding to which his spouse is a party ... does not have a privilege under this article in the proceeding in which such testimony is given""].) It thus appears that the only defect in the proceeding was that the prosecution called Ms. Rogers before the defense did so. It is far from clear that this justified striking her initial testimony; surely it would not have prevented the prosecution from recalling her to recapitulate that testimony *after* she testified for her husband.

On April 1, 2004, at around noon, Paulette Tran was robbed of about $1,500 which she was attempting to deposit for her employer at a Bank of America in Fremont. The money was contained in a grey Bank of America bag, a little bigger than an envelope, with a zipper and the Bank's symbol. She had walked to the bank from her place of employment on the opposite side of a parking lot. About 10 feet from the bank she heard a voice behind her saying hey or something. As she turned around, the robber snatched the bag. He was an African American man, in his late 20s or so, weighing ""like 200 pounds or something."" He ran off and she ran after him. She followed him down some stairs, through a court, to a street where he got into a parked Honda Accord, maroon, from the late 80s or early 90s. Halfway through this chase he dropped the deposit bag and had to turn back for it, giving her a second look at his face. She saw his license number, which she repeated to herself for about 30 seconds until she could write it down on her hand. A few minutes later she called 911 and gave them the number, 2VXU317. Two weeks later she viewed a photographic lineup from which she ""[i]mmediately"" identified defendant as the robber. She also identified defendant as the robber at the preliminary hearing and at trial. The license number she gave in her 911 call number was assigned to a black Honda Accord registered to defendant.

The first of the two charged offenses occurred on on April 10, 2004, when Maria Larios was robbed at a Bank of America branch on Calaveras in Milpitas. She had gone to the bank with two coworkers, Yahayra Cruz and Christopher Olague-Garcia, to make a deposit for the pizza parlor where they worked. They got to the bank around 10:40 in the morning. The three of them approached the bank, Ms. Larios carrying a blue Bank of America deposit bag containing about $2,000. A young African American man was standing near the door talking on a cell phone. As Mr. Olague-Garcia held the door for Ms. Larios, the man stepped in front of her, touched her neck, grabbed the deposit bag, and started running. Mr. Olague-Garcia chased him but Ms. Larios called him back lest something happen to him. As discussed more fully in part I, *post,* none of the three witnesses identified defendant as the robber.

The second charged offense arose from the robbery of Hendrika Dalhuisen on April 17, 2004, at a Bank of America on North Mathilda in Sunnyvale. She had driven there around 10:00 a.m. to deposit about $6,800 in checks and $4,500 in cash for her employer, a tennis club. She carried the deposit in a light grey zippered pouch with a bank emblem. As she walked toward the bank she saw an African American youth selling candy near the entrance, and an African American man standing next to him. The man saw her coming and walked towards her. She had been holding the deposit in her left hand, but began transferring it to her right when she noticed that the man was going to pass on her left. While she still had both hands on it, the man grabbed it. She held on and started yelling for help, but he won the ensuing tug of war when she let go with one hand to try to punch him. He ran off towards the back of the bank parking lot. She followed. She didn't really get a look at the robber's face. She estimated his age at ""around 30, past 30."" She estimated his weight at ""maybe 180."" With memory refreshed, she agrees that she did tell police he weighed 200-225. She estimated his height at ""about six feet."" She did not think she could identify him.

1
2
3
4
5
6
7
8
9
10

Josiah Greer, who was 14 years old at the time of trial, testified that he was selling candy in front the Sunnyvale Bank of America on April 17, 2004, when a man approached him and engaged in a brief conversation. The man started walking away, but reversed tracks and resumed the conversation. Then he turned around and starting grabbing at a bag in the hands of a passing lady. After a scuffle, the man grabbed the bag and ran. Josiah testified that if he saw the robber again, he would be able to identify him. He had previously identified defendant as the robber in a photographic lineup. He also identified defendant as the robber at trial.  Hector Plascencia testified that he was using an ATM in front of the Sunnyvale Bank of America when he heard a scream and turned to witness a struggle near the front entrance to the bank between an older woman and a man. The man seemed to be ""trying to pry something off of her shoulder that she was holding onto."" When he started running, Mr. Plascencia chased him. He saw the fugitive cross the parking lot, jump over a wall, run around a building, and get into a four door black Honda Accord. He also reached the car and bent the car's license plate toward him for a better look, repeating the number to himself. The number he gave police was 4XVU314. He told them he was confused as to the first digit, which could be a 3. Records of the Department of Motor Vehicles, admitted in evidence, showed that there was no record on file for plate number 4VXU314, that 3VXU314 is registered to a Trung Tran, and that 2VXU317, as noted above, is assigned to defendant's black Honda Accord.

11
12

Mr. Plascencia also saw the robber's face. He identified defendant as the robber in a photographic lineup and again at trial.

13

**STANDARD OF REVIEW**

14      A federal court may grant a writ of habeas corpus to a state prisoner only if the state

15  court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application

16  of, clearly established Federal law, as determined by the Supreme Court of the United States" or

17  were "based on an unreasonable determination of the facts in light of the evidence presented" in the

18  state courts.  28 U.S.C. § 2254(d).  Under the "contrary to" clause, a state court's decision is

19  contrary to federal law if it "contradicts the governing law set forth in our [United States Supreme

20  Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision

21  of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*,

22  529 U.S. 362, 405-06 (2000); That test does "not require citation of our cases -- indeed, it does not

23  even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court

24  decision contradicts them." *Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  The ultimate

25  controlling authority is the Supreme Court's holding, as opposed to the dicta, of its decisions at the

26  time of the relevant state-court decision. *Williams v. Taylor,* 529 U.S. at 412.  The state courts are

27  presumed to "know and follow the law," and the standard for evaluating state-court rulings, which

28  are given the "benefit of the doubt," is "highly deferential." *Woodford v. Visciotti*, 537 U.S.19, 24

(2002) (per curiam).  In order to warrant habeas relief, the state court's application of clearly

established federal law must be not merely erroneous or incorrect but "objectively unreasonable."

*Williams v. Taylor*, 529 U.S. at 409; *see also Woodford v. Visciotti*, 537 U.S. at 25.  It is the habeas

petitioner's burden to make that showing.  *Id.*

**ARGUMENT**

**I.**

**THE STATE COURT OF APPEAL'S DETERMINATION THAT THERE WAS SUBSTANTIAL EVIDENCE THAT PETITIONER COMMITTED THE MILPITAS ROBBERY WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT AUTHORITY**

**A.    Petitioner's Contention**

Petitioner contends that the evidence was insufficient to sustain his conviction for the

Milpitas robbery.  Petition, i.  We disagree. The state court of appeal's decision rejecting this

contention was not an unreasonable determination of fact, nor an unreasonable application of

controlling United States Supreme Court authority.

**B.    The State Appellate Court Decision**

Sufficiency of Evidence of Milpitas Robbery
Defendant contends that the evidence at trial was constitutionally insufficient to
support a finding beyond a reasonable doubt that he was guilty of the charge in count 1,
which was the robbery of Maria Larios on April 10, 2004, at the Bank of America in
Milpitas. Quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319, he implicitly contends
that this is a case in which no "rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt." Quoting *People v. Johnson* (1980) 26
Cal.3d 557, 577, 578, he insists that we may not confine ourselves to "isolated bits of
evidence" supporting the trial court's findings but must examine ""the whole record-i.e.,
the entire picture of the defendant put before the jury...." " Once we do so, he insists, we
must conclude that the evidence supporting defendant's conviction on count 1 was not
"substantial."

As defendant correctly notes, the case against him on count 1 was far from open-and-
shut, mainly because there was no direct evidence identifying him as the robber, and some
evidence tending to show, if credited, that he was *not* the robber. The victim, Maria
Larios, testified that the robber was a young Afro American man, between 20 and 30 years
old, wearing a white sweater, Levi pants, and what she initially described as "a red beanie
with a white letter." She could not estimate his height or weight. She testified that if she
saw the robber again, she would try to identify him, but was not sure she could. Asked
whether she saw the man who robbed her in court, she testified, "No, it's not him."
However, she also testified that a red Montreal Expos baseball cap taken from defendant's
residence looked like the hat the robber wore.

1    Yahayra Cruz testified that the robber wore blue jeans, a white sweatshirt, and a red hat with the letter M or N. The hat in evidence looked more or less like robber's hat, she said; on a scale of 1 to 10, her certainty was about 8 that the exhibit looked like the robber's hat. She thought the lettering was "not exactly" like that what she remembered, but she did remember that the lettering was white and blue, as was the lettering on the hat in evidence. She testified that if she saw the robber again, she would not "exactly" be able to identify him.

5    Christopher Olague-Garcia testified that the robber was probably 5 feet 10 inches to 6 feet 2 inches tall, African American, with light skin and "a big lower lip." Mr. Olague-Garcia saw the robber's face but didn't remember it. He thought he would be able to identify the robber if he saw him again. He did not see the robber in courtroom. The robber was wearing a red hat with the letter M. It was a fitted cap, not adjustable. It resembled the hat in evidence in this respect and in color. However, the hat in evidence had a bumpy texture and the robber's hat was smooth. In his opinion, the hat in evidence was not the robber's hat.

10    The prosecutor properly conceded in his argument below that the evidence just recited, standing alone, would not be sufficient by itself to support a finding beyond a reasonable doubt that defendant was the robber. None of the three eyewitnesses identified defendant as the perpetrator, and two of them could be understood to testify that he was *not* the perpetrator. All three of them thought defendant's Montreal Expos cap resembled the headgear worn by the robber, but one of them thought it was not the same hat. Standing alone, this testimony simply would not permit a rational factfinder to determine that defendant was the robber.

14    The evidence did not, however, stand alone. The robbery was also surrounded by a tapestry of circumstantial evidence that strongly pointed to defendant as the robber. Counting Milpitas, the court heard evidence of seven robberies, one resulting in defendant's conviction five years earlier and six within a two-month period beginning February 17, 2004. In each of the robberies but Milpitas, defendant was identified as the perpetrator by eyewitness identification, links to defendant's or his wife's car, or both. All of the robberies were perpetrated against female victims approaching a bank bearing a deposit bag. All of the robberies took place at branches of the same bank-a bank that apparently issued distinctively colored and marked deposit bags to its business account holders. All but two of the deposit bags bore these distinctive marks and colors, minimizing any doubt about their contents. All of the robberies were committed in the morning or early afternoon.

20    In four of the robberies, including Milpitas, the robber positioned himself near the bank entrance and engaged in some seemingly innocuous activity for the evident purpose of putting his target at ease. In one case (the last), he feigned interest in buying candy from a youthful vendor near the entrance. In two others, including Milpitas, he appeared to be talking on the phone until he suddenly grabbed the deposit bag from the victim. Two of the robberies, including Milpitas, were committed right at the bank door. In all of the robberies but the first, the robber escaped the immediate vicinity of the robbery by running, not driving. This fact could be reasonably viewed as be a response to the one exception, Dublin, where defendant was apparently captured and convicted precisely *because* he had parked his getaway car at the scene of the crime, enabling a third party to phone in his license number while he was stuck in traffic.

27    Further, as the trial court observed, the locations of the robberies made up a distinctive geographic pattern centering on defendant's Fremont home. The prosecutor described the pattern as spokes of a wheel, but it would be more accurate to describe it as an angular S or mirror-image Z. The 1999 Dublin robbery marks the right end of the upper

arm; almost due west of this point, the first of the 2004 robberies, Castro Valley, marks the northern point of a nearly straight line running south-southeast to the penultimate robbery in Milpitas, where the pattern turns sharply west to Sunnyvale, completing the figure. Defendant's home sat in the middle of the main, diagonal leg, between the Union City robbery and the Fremont robbery. The Milpitas robbery, which is the subject of defendant's evidentiary challenge, falls squarely within this pattern, and indeed provides the pivot point linking the preceding robberies to the final robbery in Sunnyvale. It bears emphasis that these locations do not simply mark a geometric figure, but one that was drawn, as it were, in chronological sequence, beginning at the top and proceeding to the bottom, like a pen on paper.

Defendant cites cases to the effect that the commission of other similar offenses can only establish the identity of the perpetrator of a charged offense if the similarities are "so unusual and distinctive as to be like a signature." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403, quoting 1 McCormick on Evidence (4th ed.1992) §§ 190, pp. 801-803; see *People v. Bean* (1988) 46 Cal.3d 919, 937.) Defendant does not dispute that the crimes here satisfied this test for purposes of admissibility under Evidence Code section 1101. Instead he seems to contend that the common features of the crimes are not distinctive enough to counterbalance *the failure of the Milpitas eyewitnesses* to identify him as the robber. But we are aware of no categorical rule that requires acquittal when the eyewitnesses to a crime testify that the defendant does not match their memory of the perpetrator. Where other evidence strongly supports an inference that the defendant is the culprit, the failure of eyewitnesses to recognize him is simply a factor for the trier of fact to weigh. After all, "the vagaries of eyewitness identification are well known...." (*People v. McDonald* (1984) 37 Cal.3d 351, 363, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914, quoting *United States v. Wade* (1967) 388 U.S. 218, 228; see CALJIC No. 2.92.)

The trial judge, sitting as trier of fact, was entitled to conclude that the eyewitnesses were simply in error in view of the facts inculpating defendant, i.e., that someone closely resembling him, and wearing a distinctive hat similar to his, committed a robbery using his distinctive methods, and chose to do so at a time and place fitting perfectly in a sequence of similar robberies perpetrated by him.

Nor was the court obliged to take the testimony of the eyewitnesses here at face value. Two of them testified implausibly that the robber delivered a paralyzing "pinch" to the victim. (See discussion, *post.*) The third, Mr. Olague-Garcia, conceded early in his testimony that he saw the robber's face, but did not remember it. His opinion that the baseball cap in evidence was not the cap worn by the robber could also be rationally viewed as a product or misperception or misrecollection. He did not testify that he remembered a distinctive feature that was missing from the cap in evidence. Rather he noticed a feature in the latter-a bumpy texture-that he had not seen in the robber's hat. A factfinder could rationally conclude that he overlooked this apparently subtle feature in the heat of the moment, notwithstanding his testimony that he was concentrating on the robber's headgear as the most visible element of his appearance. The chase, after all, was brief, ending when Ms. Larios called to Mr. Olague-Garcia to desist for his own protection.

Defendant points to two "very significant differences" that he contends "distinguish the Milpitas case" from the other six robberies in evidence. The first is that "the female victim was alone in every other case while in Milpitas she was with two other people...." It is true that none of the other victims was shown to be accompanied by other people while approaching the bank. However it cannot be said that all of the other victims were truly "alone." The 1999 Dublin robbery was witnessed by another bank customer while sitting in her car, apparently in the bank's parking lot. More tellingly, the Sunnyvale robbery, which occurred one week after Milpitas, was perpetrated in the plain view of

both Josiah Greer, who was selling candy 10 feet away, and Hector Plascencia, who was using an ATM 20 feet away. Whether this reflected growing carelessness, increased desperation, or declining luck on defendant's part, it clearly demonstrated that he would not be deterred by the mere presence of third parties.

Defendant's second "very significant difference[ ]" is that the Milpitas robber "pinched Larios to get the bag away, an act that was unlike anything that occurred in any other robbery." This testimony was indeed unique, but it was also somewhat difficult to credit. The victim, Ms. Larios, testified that as her coworker opened the door, defendant stepped in front of her and stopped her, whereupon "I felt something weird, like my legs got paralyzed. I was totally paralyzed. I couldn't move. That's when he grabbed the envelope and ran away." This feeling of paralysis was associated with a "stabbing" sensation to the left side of her neck. It felt like the robber "punched [her] with a needle or something very sharp, ... but [she] didn't have any marks or anything." She also described it as a "pinch" that seemingly rendered her unable to move. One of her coworkers, Ms. Cruz, testified that she also saw the robber "pinch" Ms. Larios, who did not shout out in pain, but "was just paralyzed for that moment." The other, Mr. Olague-Garcia, testified that he saw the robber "doing something" with his right hand while reaching for the deposit bag with his left. He believed the robber "must have touched her like probably in the neck or shoulder or something...."

According to defendant, this testimony establishes that the Milpitas robber used "more force than occurred in any of the other crimes." A factfinder might have reached that conclusion if it believed that the robber in fact applied some kind of immobilizing "pinch" to the victim. However, a rational factfinder would not be obliged to credit this testimony. We are aware of no real-world technique for temporarily "paralyzing" a person merely by pinching, or even punching or hitting, her neck. To the extent one of the victim's coworkers corroborated this supposed event, a factfinder could reasonably infer that their accounts had infected one another by way of the conversations they would naturally be expected to have about the robbery. A factfinder could quite reasonably infer that the "force" witnessed by them consisted at most of holding the victim at the neck while relieving her of the deposit bag. This would resemble the testimony of Castro Valley victim Carolyn Vane that defendant grabbed her shirt with one hand, incidentally ripping off her employee badge. She believed he was holding her with that hand so she wouldn't fall, while he grabbed the deposit bag with his other hand. A factfinder could quite reasonably determine that the Milpitas robbery involved no more force than this.

Defendant also asserts that, in contrast to the other victims, the Milpitas victim "was accosted as she entered the bank doors rather than on the approach to the doors...." But several other victims were robbed while opening, or on the verge of opening, the bank doors. Suman Goyal, the victim of the Union City robbery, testified, "As soon as I go in the bank, I tried to open the door, one person came from behind and snatched the bag and ran away." Carolyn Vane, the Castro Valley victim, testified that defendant walked immediately ahead of her to the door, where he stopped as if to open it for her, then turned, grabbed her, and snatched the deposit bags. Paulette Tran, the Fremont victim, was "[a]bout 10 feet from the bank" when defendant ran up and grabbed her deposit. The fact that the Milpitas victim was actually stepping through the door, instead of approaching it, suggests an accident of timing, not a distinguishing characteristic in the method of commission.

Defendant states that in Milpitas, "unlike in the other cases, no one saw the perpetrator ... get into a car, but only saw him run off on foot." On the contrary, two other robberies resembled Milpitas in this respect. Carolyn Vane (Castro Valley) only saw the robber run out of the bank's parking lot, ""into the next parking lot and beyond that to the street, and that's where I lost sight of him."" Catherine Travis (Hayward) "chased him a

little way but I knew I couldn't catch him so I just wanted to remember what he was wearing so I could tell the police." In neither of those cases did anyone testify that defendant was seen getting into a car. Indeed, of the seven victims, only Paulette Tran (Fremont) managed to chase the robber far enough to see him get into a car. In every other case where a car was seen, it was seen by a third party who chased the robber after witnessing the robbery or hearing a hue and cry by the victim. In any event, the point urged by defendant is largely or entirely irrelevant. It does not suggest a distinction in the mode of commission of the Milpitas robbery but at most reflects a logical consequence of the absence of a witness who saw the robber complete his getaway.

We agree with defendant that a witness's affirmative testimony that a defendant is not the perpetrator of a charged offense must be taken seriously in assessing the sufficiency of the evidence to support a conviction. It is not, however, conclusive, and it does not prohibit a factfinder from determining beyond a reasonable doubt that the defendant is indeed the perpetrator. Here it would have required an astonishing, Ripley's-Believe-It-Or-Not series of coincidences for defendant not to have been the Milpitas robber. Another person would have had to appear who looked like defendant, had a hat like his, used his distinctive method to commit the robbery, and chose a time and location fitting perfectly into the pattern of defendant's other offenses. While the court would certainly have been entitled to entertain a reasonable doubt about defendant's guilt, it was not obligated to do so.

Exh. C.

## C. The Decision Of The State Court Of Appeal's Was Not An Unreasonable Application Of Controlling United States Supreme Court Authority

Federal habeas corpus relief is available to a petitioner who claims that the evidence was insufficient to support his or her conviction only where, considering the trial record in the light most favorable to the prosecution, 'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.' *Jackson v. Virginia,* 443 U.S. 307, 324 [] (1979). This standard is applied with reference to substantive elements of the criminal offense as defined by state law.  See *id.*, at 324 n. 16 [].

*Windham v. Merkle*, 163 F.3d 1092, 1101 (9th Cir. 1998).

The *Jackson* inquiry does not focus on whether the trier of fact made a correct guilt or innocence determination, but whether it made a rational decision to convict or acquit.  *Herrera v. Collins*, 506 U.S. 390, 402 (1993).  The credibility of witnesses is beyond the scope of sufficiency review.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  That is, a federal court will not re-hash the weight of the evidence.  *Shumate v. Newland*, 75 F.Supp.2d 1076, 1097 (N.D. Cal. 1999).  If the record supports conflicting inferences, the reviewing court on sufficiency review must presume that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution. *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994), citing *Jackson*, 443 U.S. at 326. A reviewing court, faced with a record of historical facts containing conflicting inferences, must presume, even if it does not appear in the record, that the trier of fact resolved any such conflicts in

1  favor of the prosecution and must defer to that resolution.  *Schell v. Witek*, 218 F.3d 1017, 1021-23

2  (9th Cir. 2000) (en banc), citing *Jackson*, 443 U.S. at 326.

3        In California, sufficiency of evidence claims follow *Jackson, supra*, 443 U.S. 307.  *People*

4  *v. Johnson*, 26 Cal.3d 557, 575-578 (1980).  On federal habeas review, the question is whether the

5  state court's application of *Jackson* was unreasonable.  *Juan H. v. Allen*, 408 F.3d 1262, 1274-1275

6  (9th Cir. 2005).

7        In this Court, petitioner claims,

8    The supreme court rejected this claim even as it acknowledged that the case against him
9    on count 1 was far from open and shut, mainly because there was no direct evidence
     identifying him as the robber and some evidence tending to show, if credited, that he was
10   not the robber.  Appellant [sic] submits that even given the deference to be given to the
     finder of fact when assessing sufficiency of the evidence [citations omitted], the court of
11   supreme court analysis exceeds that deference and improperly fails to balance the severe
     weakness in the prosecution case in order to find the evidence constitutionally sufficient.
12   This Court should [unintelligible] review to correct the Supreme Court's misapplication
     of the rules of *Jackson* and *Johnson*."

13  Petition, 11.

14        The foregoing is only petitioner's conclusion; it does not explain how the court of appeal

15  failed in its analysis.

16        Petitioner argues (following the argument he made in the state supreme court in his review

17  petition) that in resolving the issue of substantial evidence in light of the entire record the court must

18  look at the entire picture of the defendant, not just isolated bits of evidence, and judge whether the

19  evidence was substantial. Petition, 12.  Petitioner argues that the state court of appeal's decision was

20  "an abdication" of its responsibilities.  Petition, 14. We disagree.

21        The court of appeal noted the evidence relating to the cap which the robber wore and

22  explained, "None of the three eyewitnesses identified defendant as the perpetrator, and two of them

23  could be understood to testify that he was *not* the perpetrator. All three of them thought defendant's

24  Montreal Expos cap resembled the headgear worn by the robber, but one of them thought it was not

25  the same hat. Standing alone, this testimony simply would not permit a rational factfinder to

26  determine that defendant was the robber."  It was proper for the court of appeal to find that the eye-

27  witnesses were reliable as to the identification of the hat, but disregard their testimony that petitioner

28  was not the responsible.  *See United States v. Heredia*, 483 F.3d 913, 923 n.14 (9th Cir. 2007) (en

1  banc), amending and superseding 481 F.3d 1188 (9th Cir. 2007) (en banc) (jurors are not bound to

2  believe or disbelieve all of a witness' testimony; the jury may conclude that a witness is telling the

3  truth as to one part, mistaken as to another, but truthful and accurate as to a third).  Evidence is not

4  rendered insufficient simply because there are discrepancies in eyewitnesses identifications which

5  counsel can challenge for reliability on cross-examination. *United States v. Ginn,* 87 F.3d 367, 369

6  (9th Cir. 1996).  The state court of appeal's discussion of the evidence was not an abdication of its

7  responsibility; rather, it reflects an evaluative assessment of all the evidence relevant to the issue of

8  identity.

9          Petitioner argues that the red hat which the police recovered from his house "was

10  identified as similar but not that worn by the perpetrator."  Petition, 14.  In actuality, regarding the

11  red hat, the court of appeal found,  "However, [the victim in count one] also testified that a red

12  Montreal Expos baseball cap taken from defendant's residence looked like the hat the robber wore."

13  And, regarding the witness who testified that the red hat was not the same, the court of appeal

14  explained that that witness described "[t]he robber was wearing a red hat with the letter M. It was

15  a fitted cap, not adjustable.  It resembled the hat in evidence in this respect and in color. However,

16  the hat in evidence had a bumpy texture and the robber's hat was smooth. In his opinion, the hat in

17  evidence was not the robber's hat."  Olague testified that the robber wore a fitted red hat, which had

18  a letter "M" on it.  Exh. A, RT 240-241.  Shown the red hat which the police recovered from

19  petitioner's house, Olague testified that it "would be [his] idea of a fitted hat" Exh. A, RT 240,  that

20  the red  was consistent with that of the hat which the robber wore, Exh. B, RT 241, 244, and that the

21  "M" which he saw on the robber's hat "was in that position, it was in that area" of the hat which the

22  police recovered.  Exh. A, RT 244.  He testified that the robber's hat was "a little bit more

23  smoother."  Exh. A, RT 243-245.  Olague explained that "[i]n his opinion, this is not the same hat

24  that the robber wore," but conceded, "I know the way everything matches up perfectly, just the

25  texture is what's not exactly the hat I seen him wearing.  It's just the way -- -- I know the hat did not

26  have bumps because I was behind him long enough to know what he was wearing."  Exh. A, RT

27  245.  Olague's testimony that it was not the hat, based on its texture, showed only that a witness

28  perception or recollection may not be always exact.

1        But, the state court of appeal did not find the evidence substantial based upon that

2  evidence alone. Rather, the court of appeal also used evidence that petitioner committed other

3  robberies in its consideration of whether there was substantial evidence that he committed the

4  charged one.

5        Petitioner claims the other robberies he committed were not sufficient to establish that he

6  committed this one beyond a reasonable doubt. Petition, 14. Not so. In particular, he argues that

7  there was two significant differences between the charged and the uncharged robberies -- that in this

8  charged robbery the victim was with another person and was accosted as she entered the banks doors

9  rather than on the approach to the doors, and the use of force was more than occurred in other

10  crimes, whereas in the others the victim was alone and in the charged crime, no one saw the

11  perpetrator get in a vehicle while in the others there was such evidence. Petition, 17. We disagree.

12        As to petitioner's contention regarding how the robbery occurred, the state court of appeal

13  noted the victims in the Union City, Castro Valley, and Fremont robberies were also accosted near

14  the bank doors.

15        The court of appeal also found that the Dublin and Sunnyvale robberies took place with

16  other people nearby, such that those victims were not truly alone when accosted.

17        Regarding the issue of force, Larios testified that she felt pain. Exh. A, RT 143-144.

18  Moreover, Larios and her two co-workers described was in practical effect a struggle for the deposit

19  bag, similar to the tug of war Dalhaussen described, Exh. A, RT 165-166, and similar to petitioner's

20  shoving of Vane, the victim of the February 17, 2004 uncharged Castro Valley robbery, which

21  caused her to lose her balance. Exh. A, RT 255-257.

22        As to the evidence regarding petitioner's manner of escape, we note the court of appeal's

23  explained that the witnesses in the Castro Valley and Hayward robberies saw petitioner run off on

24  foot, until they lost sight of him.

25        In sum, the state court seriously considered the points raised by petitioner, including the

26  fact that some witnesses to the Milpitas robbery testified petitioner was not the perpetrator. The

27  state court reasonably concluded that the trial court could find sufficient evidence that petitioner

28  committed the Milpitas robbery in light of all the circumstances.

1     *///*

2

**II.**

3
4
5

**THE DECISION OF THE STATE APPELLATE COURT REGARDING PETITIONER'S WAIVER OF HIS RIGHT TO A JURY WAS NOT AN UNREASONABLE DETERMINATION OF FACT NOR UNREASONABLE APPLICATION OF UNITED STATES SUPREME COURT AUTHORITY**

6     **A.    Petitioner's Claims**

7     Petitioner claims, "The court failed to fully inform [him] of the rights he was waiving by

8 waiving jury trial and then it abused its discretion when it refused to allow [him] to withdraw his

9 waiver of jury trial without determining the reasons for that request." Petition, i. The state court

10 of appeal's decision rejecting this contention was not an unreasonable determination of fact, nor an

11 unreasonable application of controlling United States Supreme Court authority.

12     **B.    The State Court Of Appeal's Rejection Of Petitioner's Claim**

13     The state court of appeal's rejected petitioner's claim:

14     II. *Jury Trial*

15     A. Waiver

16
17
18

Defendant contends that the court erred in conducting a nonjury trial because (1) defendant was inadequately informed of the rights he relinquished by waiving a jury, and (2) the court later failed to inquire adequately into defendant"s reasons for seeking to be relieved of that waiver. Neither contention can be sustained.

19
20
21
22
23

The right to a jury trial in criminal cases is guaranteed by both the federal and state Constitutions. (U.S. Const., 6th & 14th Amends.; *Duncan v. Louisiana* (1968) 391 U.S. 145, 148-150, 155-156; Cal. Const., art. I, §§ 16.) It is recognized as a "fundamental" constitutional right. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281-282.) A defendant may waive the right, but for the waiver to be effective there must be he "evidence in the record that the decision to do so was knowing, intelligent, and voluntary." (*People v. Collins* (2001) 26 Cal.4th 297, 305, fn. 2, italics added (*Collins*).) It must appear that the waiver was "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it, and was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Id.* at p. 301.)

24
25
26
27
28

Defendant does not suggest that his waiver of jury trial was coerced or otherwise involuntary. Rather he argues that he did not act knowingly and intelligently because he was not told that any verdict must be *unanimous.* In *People v. Tijerina* (1969) 1 Cal.3d 41 (*Tierina*)-a case not cited by either party-the California Supreme Court appears to have resolved this issue adversely to defendant. The defendant there "assert[ed] that his waiver of the right to a jury trial was ineffective" in that "he was not told that a jury"s verdict must be unanimous." (*Id.* at p. 45.) The court rejected this contention, noting that the defendant was represented by counsel, that he was "carefully questioned" before his jury waiver was accepted, that he said he knew what a jury trial was, and that "he was also told

14

that 'That is when twelve people sit over here in the box and hear all the evidence." (*Id.* at pp. 45-46.) Given these circumstances, the court concluded, the trial court ""was not required to explain further to defendant the significance of his waiver of a jury trial."" (*Id.* at p. 46.)

We can detect no significant difference between the proceedings held sufficient in *Tijerina* and those under scrutiny here. Directly addressing defendant, the court below said, "You, sir, understand that as to every single charge against you, as to every single prior which has been alleged as an enhancement in your case, and as to all of the factors the Court considers in sentencing you, if a Court were to sentence you[,] to the upper or maximum term, you are entitled to have a trial by a jury of twelve citizens listen to the evidence and determine if your guilt has been proven beyond a reasonable doubt. And they must make specific findings as to the truth of any allegation of a prior or any factor that might be considered in imposing the upper term in your case. Do you understand all of that? [¶¶] THE DEFENDANT: Yes. [¶¶] THE COURT: And you now wish to give up your right to have those issues tried by the jury and instead to have them tried directly by a judge or court as the trier of fact? [¶¶] THE DEFENDANT: Yes. [¶¶] THE COURT [to counsel]: Mr. Sharkey, have you thoroughly reviewed with your client his constitutional rights with respect to this issue and satisfied yourself that your client fully understands the giving up of those rights? [¶¶] MR. SHARKEY: Yes, Your Honor. [¶¶] THE COURT: And are you also satisfied that his decision to do so is knowing, intelligent and voluntary? [¶¶] MR. SHARKEY: I am, Your Honor. [¶¶] THE COURT: Do you concur in the decision? [¶¶] MR. SHARKEY: I do, Your Honor. [¶¶] THE COURT: Mr. Rogers, I asked your attorney if your decision was knowing, intelligent and voluntary and he believes that it is and I want to follow up with you just a moment. [¶¶] What I want to know, if anyone has made any kind of promise, threat, inducement or in other words offered you anything at all in order to get you to make this decision? [¶¶] THE DEFENDANT: No. [¶¶] THE COURT: You are doing this freely and voluntarily of your own free will? [¶¶] THE DEFENDANT: Yes." (2 RT 122) After confirming that the prosecution also waived jury trial, the court continued the matter for nonjury trial.

Defendant cites *People v. Wrest* (1992) 3 Cal.4th 1088, 1105 (*Wrest*), where the court held a jury waiver advisement sufficient because the record disclosed that "a complete description of the essential elements of jury trial" was conveyed to the defendant and that he expressly affirmed his "understanding of those elements." Defendant notes that the advisement there included the statement that "[a]ll 12 citizens would have to agree that you were guilty in order to be convicted [*sic*] of any charge against you. And all 12 citizens would have to agree that you are not guilty in order to acquit you." (*Id.* at pp. 1103-1104.) The apparent implication of defendant"s argument is that unanimity is one of the "essential requirements of jury trial," an understanding of which must appear on the record. Such a reading would mean that the court had, in *Wrest,* overruled *Tijerina* by implication. We will not lightly adopt such a view, particularly since there is no indication that the court even considered the issue in *Wrest.* The only question there was whether the admonitions actually given were *sufficient* to satisfy constitutional standards. The court had no occasion, and did not purport, to decide which of those admonitions were constitutionally *necessary.* In *Tijerina* it squarely rejected a contention that the defendant must be advised of the unanimity requirement. We are not free to depart from that holding. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.
Rule of Stare Decisis)

Defendant also contends that the court erred by failing to delve into his reasons when, at the continued trial some six weeks after the proceedings just described, he sought to be relieved of his waiver and to proceed with a jury trial. The relevant events appear as follows in the transcript: When the court called the matter, defense counsel asked, apparently of defendant, ""Do you want to ask her [i.e., the judge] about that?"" Counsel

Memorandum of Points & Authorities -                                    Rogers v. Evans -  C 07-4658 CRB (PR)

then said to the court, "Mr. Rogers would like to address the Court regarding the jury trial waiver." (2 RT 128) The court demurred, saying, "Counsel, I will hear from you in this regard. Mr. Rogers is more than competently represented in this matter." The following then occurred: "MR. SHARKEY: Mr. Rogers is requesting a jury trial at this time. [¶¶] THE COURT: All right. And the grounds for that request? He had previously waived his right to jury trial. [¶¶] MR. SHARKEY: Mr. Rogers has changed his mind and he would like to have his case tried before a jury rather than a court. [¶] THE COURT: Counsel, when we were here last in court, it was for purposes of beginning the jury trial in this matter. At that time, this Court had summoned 120 prospective jurors who were to participate in the jury selection process on that same date. Before that process could commence, I was informed by both counsel that each had agreed to engage in trial by court rather than trial by jury. [¶¶].... [A]t that time I conducted a very direct and clear inquiry of you personally, Mr. Rogers. [¶¶] I explained to you at that time that you had the right to have a trial by jury.... [¶¶] You indicated a full understanding of those things, your attorney indicated to me that he had discussed the matter with you and that he was satisfied that you fully understood those things and you then voluntarily gave up your right to have a trial by jury. [¶¶] In addition, I asked you very clearly and specifically if anyone had made any kind of threat, promise, inducement or had attempted to coerce you in any way into giving up those rights and you indicated that they had not. And I asked you if your decision was made freely and voluntarily on your part and you indicated that it was. [¶¶] And, sir, I am completely satisfied that you made a knowing and intelligent waiver of your right to have a tr[ia]l by jury on all issues in this case, and for that reason we will now proceed with trial by court. [¶¶] Anything further, counsel?"

As this point the prosecutor offered the observation that he had been prepared to go forward on the original trial date but that the defense had "wanted the case continued" until after the electorate had voted on Proposition 66, passage of which might have "alter[ed] the outcome for [defendant] in this case." This led to a digression concerning whether the delay afforded by the jury waiver had served as "consideration" for that waiver. After an unrecorded conference in chambers, the prosecutor proclaimed for the record that "there was no consideration in exchange for the defendant waiving his right to jury trial...." Defense counsel confirmed that it was "not the case" that the court had "agreed to a continuance in this case in exchange for the waiver of jury trial." "Mr. Rogers," he went on, "received no promises that the case was going to be continued if he waived jury."

Defendant asserts that the court erred because it "made no inquiry about the circumstances which had caused him to" change his mind." The court did not allow appellant to speak as he had requested to do, but required counsel to make the entire argument." In addition, defendant contends, the court neglected to inquire into the factors that have been held relevant to a decision whether to relieve a defendant of a jury waiver, and did not exhibit an awareness that anything other than the validity of the waiver was relevant. Citing authorities regarding trial court discretion, defendant contends that the court below abused its discretion because it failed to "consider all factors necessary to bring about a just result."

Defendant's argument depends on two false premises, one factual and the other legal. The false factual premise is that the trial court "fail[ed] to make any inquiry into what might be motivating the request" for relief from the waiver. In fact the court inquired of counsel what were the grounds for the request, and counsel replied that defendant had changed his mind. If that was an inaccurate or inadequate account of "what might be motivating the request," the fault lies with counsel, and the remedy lies in a proceeding challenging the effectiveness of his representation of defendant. But it is at this point that defendant seeks to shift the weight of his argument to his false legal premise, which is that the trial court had a duty to plumb beneath counsel's admittedly uninformative statement to determine whether the request was actually supported by good cause, which counsel had failed or neglected to disclose. We know of no authority placing such a duty on the court, and

defendant offers none. Had defendant expressed dissatisfaction with counsel, a duty of judicial inquiry would of course have been triggered. (See *People v. Marsden* (1970) 2 Cal.3d 118.) But no such duty arises merely because a defendant wishes to obtain relief for which his attorney fails to articulate any legal justification. Unless and until counsel's effectiveness is put in issue, the court is entitled to assume, as the court explicitly did here, that counsel is in fact presenting the defendant"s case as well as it can be presented.

There is no suggestion that defendant actually had legal cause for relief from his waiver. If such cause existed, the remedy lies in a proceeding that would permit the defendant to establish that cause by introducing extrinsic evidence. Again, its relevance would seemingly be to establish that counsel rendered ineffective assistance, not that the court erred in failing to conduct further inquiry.

Defendant asserts that the court abused its discretion by failing to establish on the record that it weighed the factors bearing on the appropriateness of granting defendant"s request. We know of no authority placing such a burden on the court. "It is well established that a waiver of a jury trial, voluntarily and regularly made, cannot afterward be withdrawn except in the discretion of the court. [Citations.] *Absent special circumstances the court may deny a motion* to withdraw such a waiver especially where adverse consequences will flow from the defendant"s change of mind. In exercising its discretion the court may consider such matters as the timeliness of the motion to withdraw the waiver, the reason for the requested withdrawal and the possibility that undue delay of the trial or inconvenience to witnesses would result from granting the motion." (*People v. Chambers* (1972) 7 Cal.3d 666, 670-671, italics added.)

This language indicates that (1) the burden of justifying a withdrawal rests on the defendant; (2) at least in the absence of "special circumstances," an untimely motion can be denied for that reason alone; and (3) an abuse of discretion is unlikely to be found where granting the request would produce undue delay or inconvenience. The order challenged here can be sustained on either of the first two points without more. However, defendant cites *People v. Osmon* (1961) 195 Cal.App.2d 151 (*Osmon*), for its suggestion that a defendant may be entitled to withdraw a jury waiver if the request is "made sufficiently in advance of trial so as not to interfere with the orderly administration of the business of the court or to result in unnecessary delay or inconvenience to witnesses or to the prejudice of the other party to the action...." (*Id.* at p. 154, quoting *People v. Melton* (1954) 125 Cal.App.2d Supp. 901, 904.) There the trial court was held to have abused its discretion because the request was made a week before the scheduled trial date and 10 days before the matter was actually transferred to the trial judge-plenty of time to avert any apparent harm. (*Osmon, supra,* 195 Cal.App.2d at pp. 154-155.) Here of course the request was not made "in advance of trial" at all, but at the very time appointed for trial.

Moreover, the record supports a finding, which we will infer in support of the court's ruling, that granting the request would have interfered with the orderly administration of the business of the court. The record does not show how much time would have been lost in summoning prospective jurors to the courtroom, but it clearly establishes substantial inconvenience to witnesses. First, it appears that a number of them were already on hand to testify, as reflected in the fact that seven of them *did* testify before the noon recess. Ultimately 24 witnesses would testify over two days. At a minimum, granting defendant"s belated request would have required sending a number of those witnesses away while a jury was selected-a process that might take days given the number of witnesses and potential grounds for juror disqualification.

In any event, contrary to defendant's suggestion, the trial court did not have to enumerate all these considerations on the record to establish a sustainable exercise of discretion. In the absence of a prescriptive rule demanding such an on-the-record

1  recitation, the court's ruling will be presumed correct and findings will be inferred in its
2  support insofar as the record contains substantial evidence to support them. *See People
   v. Wiley* (1995) 9 Cal.4th 580, 592 [invoking presumption of correctness of judgments in
3  support of inferred finding that prior convictions met criteria for sentence enhancement
   sustained by trial court]. Here the record amply demonstrates that granting defendant''s
4  request would have disrupted the orderly administration of justice and inconvenienced the
   witnesses and other participants in the trial. The record fails to suggest any justification
5  for the belated request. Under these circumstances, nothing approaching an abuse of
   discretion can appear.

6  **C.    Discussion**

7      **1.    The State Court Of Appeal's Decision Was A Reasonable Determination
            Of Fact And Reasonable Application Of Controlling United States
8            Supreme Court Authority**

9      The Sixth Amendment guarantees an accused the right to a trial by jury. But a criminal

10  defendant may waive the constitutional right to a jury trial if the waiver is made voluntary,

11  knowingly and intelligently. *Patton v. United States*, 281 U.S. 276, 312-313 (1930), overruled on

12  other grounds by *Williams v. Florida*, 399 U.S. 78 (1969); *Brown v. Burns*, 996 F.2d 219, 212 (9th

13  Cir. 1993). Such waivers occur where the defendant understands the significance of the decision

14  and makes the decision free from coercion. *See Godinez v. Moran*, 509 U.S. 389, 401, n. 12 (1993)

15  (concerning waiver of the right to counsel); *Adams v. Peterson*, 968 F.2d 835, 837, n. 1, 843-844

16  (9th Cir. 1992) (en banc).

17      Here, petitioner relies upon the argument he made to the state supreme court in his petition

18  for review. In that petition, petitioner argued that his waiver was involuntary because he was not

19  advised that a jury verdict of guilt had to be unanimous. Exh. E, 16-17. Petitioner failed to address

20  *Tijerina,* 131 Cal.3d 41, upon which the court of appeal relied and which held a defendant need not

21  be told that a jury's verdict must be unanimous. He presents here no United States Supreme Court

22  case to the contrary. That is, he cites no United States Supreme Court case which holds that a jury

23  trial waiver is involuntary if a defendant is not told the verdict must be unanimous. In fact, the

24  Supreme Court "has not held that the Constitution imposes a jury unanimity requirement."

25  *Richardson v. United States*, 526 U.S. 813, 821 (1999); *Schad v. Arizona*, 501 U.S. 624 (1991);

26  *Apodaco v. Oregon*, 406 U.S. 404 (1972). It follows that an express advisement that a defendant

27  has a right to a unanimous jury is not constitutionally required in order for a jury trial waiver to be

28  knowing and voluntary. *United States ex rel. Williams v. De Robertis*, 715 F.2d 1174, 1177-1178

1    (7th Cir. 1983); *Bueno v. Walsh*, 2002 U.S. Dist. LEXIS 12618, *38-44 (S.D. N.Y. 2002).

2    In any event, here the trial court said, "You are entitled to have a jury trial of twelve

3    citizens listen to the evidence and determine if your guilt has been proved beyond a reasonable

4    doubt." (Exh. A, RT 122.) The plain meaning of the court's words were that those "twelve citizens"

5    who were to "determine his guilt," had to all agree because those 12 people constituted the jury. In

6    other words, the court described a process which implicitly entailed unanimity. Several cases have

7    found an effective waiver of jury trial following the mere admonition that defendant was entitled to

8    a jury of 12 people to determine the matter. *People v. Rodriguez*, 275 Cal.App.2d 946, 950-951

9    (1969); *People v. Martin,* 111 Cal.App.3d 973, 979-980 (1981). In the instant case, the waiver of

10   jury trial advisement used by the trial court is virtually identical to the advisements used in

11   *Rodriguez* and *Martin*. Petitioner was advised that he would be giving up his right to have 12 people

12   decide his case. Exh B, RT122. He unequivocally answered that he would waive such right and

13   have the case tried by the trial judge. *Id.* In light of *Rodriguez* and *Martin*, petitioner's claim fails.

14   Petitioner cites *Wrest, supra*, 3 Cal.4th 1088. That case is unavailing. He argues that

15   *Wrest* stands for the proposition that the word unanimous must be used. We disagree. *Wrest* was

16   not presented with the issue of whether a defendant must be informed by the use of the word

17   unanimous in obtaining a waiver of the right to a jury trial, and so is not authority for that

18   proposition. In any event, habeas relief must be based upon United States Supreme Court authority.

19          **2.     The Claim Regarding Reconsideration Does Not Raise A Federal
                      Claim; In Any Event, It Has No Merit**

20

21   In his review petition to the state supreme court, petitioner did *not* claim that a

22   reconsideration of his decision to waive jury trial was constitutionally based; hence, petitioner's

23   claim here must be dismissed he relies upon his state supreme court review petition. That is,

24   petitioner points to no United States Supreme Court decision which holds that a defendant who is

25   represented by counsel, who has voluntarily and intelligently waived his right to a jury trial, has the

26   federal constitutional right to unilaterally withdraw the waiver simply because he has changed his

27   mind. Further, petitioner's claim that the trial court abused its discretion by failing to make a

28   sufficient record does not raise a federal constitutional question. *See Schell v. Witek*, 218 F.3d 1017,

1    1024-1025 (9th Cir. 2000) (en banc).

2               In any event, the trial court properly handled defense counsel's statement on

3    November 29, 2004, that petitioner had changed his mind and wanted a jury trial.

4        It is well-established that a waiver of a jury trial, voluntarily and regularly made,
         cannot afterwards be withdrawn except on the discretion of the Court. [Citations
5        omitted.]  Absent special circumstances the Court may deny a motion to withdraw
         such a waiver especially where adverse consequences will flow from the defendant's
6        change of mind.  In exercising its discretion the Court may consider such matters as
         the timeliness of the motion to withdraw the waiver, the reason for the requested
7        withdrawal and the possibility that undue delay of the trial or inconvenience to
         witnesses would result from granting the motion.

8

9    *People v. Chambers,* 7 Cal.3d 666, 670-671 (1972).

10              Counsel explained petitioner's reason for seeking withdrawal of the jury waiver was

11   that petitioner "changed his mind." Exh. C.  That reason did not constitute a "special circumstance."

12   Defense counsel provided no other reason.  As the state court of appeal  explained, 120 potential

13   jurors were present when petitioner freely and voluntarily waived a jury.  His "change of mind"

14   came on the first day of his court trial.  Allowing petitioner to withdraw his waiver would have

15   necessitated another continuance to obtain a jury panel, and resulted in numerous civilian witnesses

16   returning again.  A mere "change of mind" does not justify such costs.  *People v. Knight,* 194

17   Cal.App.3d 337, 344 (1987) [guilty plea may not be set aside under California Penal Code section

18   1018 because defendant changes his or her mind].)  Indeed, this last discussion highlights that

19   petitioner has failed to state a federal claim because it is only a discussion that under state law the

20   superior court abused its discretion.

21

22

23

24

25

26

27

28

1

**CONCLUSION**

2    Accordingly, for the reasons stated, respondent respectfully requests that the petition

3 for writ of habeas corpus be denied.

4    Dated:  June 5, 2008

5                    Respectfully submitted,

6                    EDMUND G. BROWN JR.
                     Attorney General of the State of California

7                    DANE R. GILLETTE
                     Chief Assistant Attorney General

8
                     GERALD A. ENGLER
9                    Senior Assistant Attorney General

                     PEGGY S. RUFFRA
10                   Supervising Deputy Attorney General

11

12                   /s/ John R. Vance

13                   _____
                     JOHN R. VANCE, JR.
                     Deputy Attorney General

14                   Attorneys for Respondent

15   Rogers, C.Memo Ps&As.wpd
     SF2008400157
16   JRV:je

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points & Authorities -                    Rogers v. Evans -  C 07-4658 CRB (PR)

**TABLE OF CONTENTS**

**Page**

STATEMENT OF THE CASE                                                                1

STATEMENT OF FACTS                                                                  2

STANDARD OF REVIEW                                                                  5

**ARGUMENT**                                                                       **6**

**I.     THE STATE COURT OF APPEAL'S DETERMINATION THAT
         THERE WAS SUBSTANTIAL EVIDENCE THAT PETITIONER
         COMMITTED THE MILPITAS ROBBERY WAS NOT
         CONTRARY TO, OR AN UNREASONABLE APPLICATION OF
         UNITED STATES SUPREME COURT AUTHORITY**                                   6

         A.    Petitioner's Contention                                              6

         B.    The State Appellate Court Decision                                   6

         C.    The Decision Of The State Court Of Appeal's Was Not An Unreasonable
               Application Of Controlling United States Supreme Court Authority     10

**II.    THE DECISION OF THE STATE APPELLATE COURT
         REGARDING PETITIONER'S WAIVER OF HIS RIGHT TO A
         JURY WAS NOT AN UNREASONABLE DETERMINATION OF
         FACT NOR UNREASONABLE APPLICATION OF UNITED
         STATES SUPREME COURT AUTHORITY**                                          14

         A.    Petitioner's Claims                                                  14

         B.    The State Court Of Appeal's Rejection Of Petitioner's Claim          14

         C.    Discussion                                                           18

               1.    The State Court Of Appeal's Decision Was A
                     Reasonable Determination Of Fact And Reasonable
                     Application Of Controlling United States Supreme
                     Court Authority                                                18

               2.    The Claim Regarding Reconsideration Does Not Raise
                     A Federal Claim; In Any Event, It Has No Merit                 19

CONCLUSION                                                                          21

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Adams v. Peterson*
968 F.2d 835 (9th Cir. 1992)                                                18

5

*Apodaco v. Oregon*
6   406 U.S. 404 (1972)                                                       18

7

*Brown v. Burns*
996 F.2d 219 (9th Cir. 1993)                                                18

8

*Bueno v. Walsh*
9   2002 U.S. Dist. LEXIS 12618, *38-44 (S.D. N.Y. 2002)                     19

10  *Early v. Packer*
537 U.S. 3 (2002)                                                           5

11

*Godinez v. Moran*
12  509 U.S. 389 (1993)                                                       18

13  *Hernandez v. Small*
282 F.3d 1132 (9th Cir. 2002)                                               2

14

*Herrera v. Collins*
15  506 U.S. 390 (1993)                                                      10

16  *Jackson v. Virginia*
443 U.S. 307 (1979)                                                     10, 11

17

*Juan H. v. Allen*
18  408 F.3d 1262 (9th Cir. 2005)                                            11

19  *McMillan v. Gomez*
19 F.3d 465 (9th Cir. 1994)                                                 10

20

*Patton v. United States*
21  281 U.S. 276 (1930)                                                      18

22  *People v. Chambers*
7 Cal.3d 666 (1972)                                                         20

23

*People v. Johnson*
24  26 Cal.3d 557 (1980)                                                   6, 11

25  *People v. Knight*
194 Cal.App.3d 337 (1987)                                                   20

26

*People v. Martin*
27  111 Cal.App.3d 973 (1981)                                               19

28

**TABLE OF AUTHORITIES  (continued)**

Page

*People v. Rodriguez*
275 Cal.App.2d 946 (1969)                                              19

*People v. Wrest*
3 Cal.4th 1088 (1992)                                              15, 19

*Richardson v. United States*
526 U.S. 813 (1999)                                                    18

*Schad v. Arizona*
501 U.S. 624 (1991)                                                    18

*Schell v. Witek*
218 F.3d 1017 (9th Cir. 2000)                                     11, 20

*Schlup v. Delo*
513 U.S. 298 (1995)                                                    10

*Shumate v. Newland*
75 F.Supp.2d 1076 (N.D. Cal. 1999)                                   10

*United States ex rel. Williams v. De Robertis*
715 F.2d 1174 (7th Cir. 1983)                                        19

*United States ex rel. Williams v. De Robertis*
715 F.2d 1174 (7th Cir. 1983)                                        19

*United States v. Ginn*
87 F.3d 367 (9th Cir. 1996)                                          12

*United States v. Heredia*
483 F.3d 913 (9th Cir. 2007)                                         11

*Williams v. Florida*
399 U.S. 78 (1969)                                                   18

*Williams v. Taylor*
529 U.S. 362 (2000)                                                 5, 6

*Windham v. Merkle*
163 F.3d 1092 (9th Cir. 1998)                                        10

*Woodford v. Visciotti*
537 U.S.19 (2002)                                                   5, 6

**TABLE OF AUTHORITIES  (continued)**

1

**Page**

2

**Statutes**

3

4

28 United States Code
      § 2254, subd. (d)        5

California Penal Code
      § 211        1
      § 212.5        1
      § 667, subd. (a)        1
      § 667, subds. (b)-(I)        1
      § 667.5, subd. (a)        1
      § 667.5, subd. (b)        1
      § 1018        20
      § 1170.12        1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Memorandum of Points & Authorities -                    Rogers v. Evans -  C 07-4658 CRB (PR)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    *Calvin P. Rogers v. M.S. Evans, Warden*              No.: **C 07-4658 CRB (PR)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>June 6, 2008</u>, I served the attached:

**1.  ANSWER TO ORDER TO SHOW CAUSE**;
2.  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ANSWER TO ORDER TO SHOW CAUSE;
3.  LODGING OF EXHIBITS**

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

Calvin P. Rogers, V-74676
Salinas Valley State Prison
D-3-220
P.O. Box 1050
Soledad, CA 93960-1050

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 6, 2008, at San Francisco, California.

|                        |                       |
|------------------------|-----------------------|
| J. Espinosa            | /s/ J. Espinosa       |
| Declarant              | Signature             |

Rogers, C.POS.wpd