IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CALVIN P. ROGERS, | ) | |
| Petitioner, | ) | No. C 07-4658 CRB (PR) |
| vs. | ) | ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS |
| M. S. EVANS, Warden, | ) | |
| Respondent. | ) | |

Petitioner Calvin P. Rogers seeks a writ of habeas corpus under 28 U.S.C. § 2254 claiming insufficiency of the evidence and an invalid waiver of his right to a jury trial. For the reasons set forth below, the petition is denied.

**STATEMENT OF THE CASE**

After a court trial in Santa Clara County Superior Court, petitioner was convicted of two counts of robbery. The court also found that petitioner had suffered two prior "strike" convictions and various other prior convictions. On April 7, 2005, petitioner was sentenced under California's Three Strikes Law to fifty years to life consecutive to twenty-five years.

Petitioner unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California. On January 3, 2007, the state high court denied review.

Petitioner next filed the instant federal petition for a writ of habeas corpus under § 2254. Per order filed on January 11, 2008, the court found that the petition, liberally construed, stated cognizable claims under § 2254 and ordered respondent to show cause why a writ of habeas corpus should not be granted. Respondent has filed an answer to the order to show cause and petitioner has filed a traverse.

**STATEMENT OF THE FACTS**

The California Court of Appeal summarized the facts of the case as follows:

> Defendant was charged with two robberies: one on April 10, 2004, in Milpitas, and the other a week later in Sunnyvale. The prosecution was also permitted to present evidence of five other robberies, all committed in Alameda County, on the basis that the manner and circumstances of their commission so resembled the charged offenses that the uncharged robberies were admissible to prove the identity of the perpetrator of the charged offenses. We will therefore recite the evidence concerning all seven robberies, along with other relevant facts, in chronological sequence.
>
> On November 12, 1999, a customer emerged from a Bank of America in Dublin, where she had just made a deposit. On her way to her car she saw defendant talking on the phone. As she sat in her car talking on a cellphone, she saw another customer, a young woman, approaching the bank with a deposit pouch in her hands. The first customer looked down, and when she looked back up she saw defendant running with the deposit pouch in his hands. She followed him in her car as he entered a car and attempted to drive away. While he waited for traffic to clear, she called 911 and read defendant's license number to authorities. She identified him in a subsequent photographic lineup. At the instant trial she again identified him as the robber. Defendant was convicted of robbery in connection with those events.
>
> On February 17, 2004, Carolyn Vane was robbed at a Bank of America branch in Castro Valley. She had driven to the bank in late morning to make a deposit for her employer, a pet supply store. She was carrying two Bank of America deposit pouches, one gray and one navy blue, both with “Bank of America” on them. They contained over $3,000 in cash and a larger sum in checks. She parked her car in the bank's parking lot and approached the entrance. A man ahead of her stopped at the door, as if to open it for her. Instead he turned, grabbed her, wrested the deposit bags from her grip, and ran across the street into the parking lot of a nearby parking mall. She followed, screaming “stop, thief” at the top of her lungs. He was African American, around six feet

tall, over 200 pounds, and broad shouldered. A Department of Motor Vehicles printout admitted into evidence without objection stated that defendant is 5 feet 11 inches tall, weighs 220 pounds, and was born on September 6, 1964, making him 39 years old at the time of this robbery. Ms. Vane identified defendant as the robber at the preliminary hearing and at trial. She had failed to select anyone from a photographic lineup about two months after the robbery, but she testified that defendant's photograph was not a good likeness.

*2 On March 5, 2004, shortly after 1:00 p.m., Catherine Travis was robbed at a Bank of America branch on Mission Boulevard in Hayward, where she had gone on behalf of her employer, a cemetery, to deposit over $40,000, of which $3,000 to $4,000 was cash. She carried the money in a zippered Bank of America deposit bag, dark blue with the bank logo in red on the front. As she got out of her car she noticed a man who seemed to be approaching the bank from a nearby drugstore. When she got about 10 feet from the bank, she heard somebody running behind her. Before she had a chance to turn around, the man she had seen came in front of her, grabbed the bag from under her left arm, and ran away. She ran after him and got a further look at him, coming within three feet when he dropped his cell phone. He was black. She described his height as “probably about five-six, five-seven, five-eight.” She is five-two, and acknowledged that the robber was taller than she. She could not estimate his weight. She identified defendant as the robber at the preliminary hearing and at trial.

Shortly after 9:20 a.m. on March 12, 2004, Suman Goyal was robbed at a Bank of America Branch on Decoto Road in Union City while attempting to deposit about $12,000 in cash from her family's gas station. She was carrying the cash in a white cloth bag provided by the bank. As she tried to open the door into the bank, somebody came up behind her and snatched the bag from her hands. The robber was black, 30-40 years of age, maybe six feet tall, with a heavy build. She estimated his weight at 150-160, but then said it was “maybe more than that” and affirmed that the robber “was a heavy built person.” She described him as “bald headed, no hair on head, and chubby face.” After he snatched the bag away, she screamed and screamed. She tried to follow him, but he ran completely out of the parking lot and across the street, at which she stopped.

At the same time, Jason Mandawe was driving to work when he heard a woman screaming in the vicinity of a bank on Decoto Road. He saw a man run across the street, stop at the median island, then continue across the street. He described the man as a light-skinned African American, although he might have told police he was Puerto Rican. The witness turned into a parking lot on the chance that he might “see someone run into a car.” After driving a short distance he saw a man resembling the one he saw crossing the street, driving a small sports car that looked like an RX7 but wasn't. He thought he told police it “looked like a Miata, a RX7.” It was a dark green 2-door with a tan top, perhaps a convertible. It had no front plate, but the witness succeeded in getting the first four digits from the rear plate: “4XCX.” He followed the car

trying to get the rest of the number, but the suspect soon eluded him. Defendant's wife owned a green Mazda Miata with license 4XCX388.FN1

FN1. On November 24, 2003, defendant received a traffic ticket while driving a green two-door Mazda with license number 4XCX388. Called and examined by the prosecution, defendant's wife testified, among other things, that she had owned a green 1999 Mazda Miata. Later the prosecutor asked the court to strike all of her testimony on the ground that it had been improperly elicited because the witness had not been given an opportunity to exercise her privilege not to testify against her husband. (Evid. Code, § 970.) The court granted the request, but we note that defense counsel had also subpoenaed Ms. Rogers with the intention of having her establish an alibi testimony for defendant. After her examination by the prosecution, defense counsel in fact made her his witness and examined her toward that end. By its terms the statute did not entitle her to refuse to testify *in her husband's favor*. (Evid. Code, § 970, italics added [married person "has a privilege not to testify *against his spouse* in any proceeding"]; see 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 176, p. 447.) Once she did so, the privilege not to testify dropped away entirely. (Evid. Code, § 973, subd. (a) ["Unless erroneously compelled to do so, a married person who testifies in a proceeding to which his spouse is a party ... does not have a privilege under this article in the proceeding in which such testimony is given"].) It thus appears that the only defect in the proceeding was that the prosecution called Ms. Rogers before the defense did so. It is far from clear that this justified striking her initial testimony; surely it would not have prevented the prosecution from recalling her to recapitulate that testimony *after* she testified for her husband.

On April 1, 2004, at around noon, Paulette Tran was robbed of about $1,500 which she was attempting to deposit for her employer at a Bank of America in Fremont. The money was contained in a grey Bank of America bag, a little bigger than an envelope, with a zipper and the Bank's symbol. She had walked to the bank from her place of employment on the opposite side of a parking lot. About 10 feet from the bank she heard a voice behind her saying hey or something. As she turned around, the robber snatched the bag. He was an African American man, in his late 20s or so, weighing "like 200 pounds or something." He ran off and she ran after him. She followed him down some stairs, through a court, to a street where he got into a parked Honda Accord, maroon, from the late 80s or early 90s. Halfway through this chase he dropped the deposit bag and had to turn back for it, giving her a second look at his face. She saw his license number,

which she repeated to herself for about 30 seconds until she could write it down on her hand. A few minutes later she called 911 and gave them the number, 2VXU317. Two weeks later she viewed a photographic lineup from which she "[i]mmediately" identified defendant as the robber. She also identified defendant as the robber at the preliminary hearing and at trial. The license number she gave in her 911 call number was assigned to a black Honda Accord registered to defendant.

The first of the two charged offenses occurred on [] April 10, 2004, when Maria Larios was robbed at a Bank of America branch on Calaveras in Milpitas. She had gone to the bank with two coworkers, Yahayra Cruz and Christopher Olague-Garcia, to make a deposit for the pizza parlor where they worked. They got to the bank around 10:40 in the morning. The three of them approached the bank, Ms. Larios carrying a blue Bank of America deposit bag containing about $2,000. A young African American man was standing near the door talking on a cell phone. As Mr. Olague-Garcia held the door for Ms. Larios, the man stepped in front of her, touched her neck, grabbed the deposit bag, and started running. Mr. Olague-Garcia chased him but Ms. Larios called him back lest something happen to him. As discussed more fully in part I, *post*, none of the three witnesses identified defendant as the robber.

The second charged offense arose from the robbery of Hendrika Dalhuisen on April 17, 2004, at a Bank of America on North Mathilda in Sunnyvale. She had driven there around 10:00 a.m. to deposit about $6,800 in checks and $4,500 in cash for her employer, a tennis club. She carried the deposit in a light grey zippered pouch with a bank emblem. As she walked toward the bank she saw an African American youth selling candy near the entrance, and an African American man standing next to him. The man saw her coming and walked towards her. She had been holding the deposit in her left hand, but began transferring it to her right when she noticed that the man was going to pass on her left. While she still had both hands on it, the man grabbed it. She held on and started yelling for help, but he won the ensuing tug of war when she let go with one hand to try to punch him. He ran off towards the back of the bank parking lot. She followed. She didn't really get a look at the robber's face. She estimated his age at "around 30, past 30." She estimated his weight at "maybe 180." With memory refreshed, she agrees that she did tell police he weighed 200-225. She estimated his height at "about six feet." She did not think she could identify him.

Josiah Greer, who was 14 years old at the time of trial, testified that he was selling candy in front the Sunnyvale Bank of America on April 17, 2004, when a man approached him and engaged in a brief conversation. The man started walking away, but reversed tracks and resumed the conversation. Then he turned around and starting grabbing at a bag in the hands of a passing lady. After a scuffle, the man grabbed the bag and ran. Josiah testified that if he saw the robber again, he would be able to identify him. He had previously identified defendant as the robber in a photographic lineup. He also identified defendant as the

> robber at trial.
>
> Hector Plascencia testified that he was using an ATM in front of the Sunnyvale Bank of America when he heard a scream and turned to witness a struggle near the front entrance to the bank between an older woman and a man. The man seemed to be "trying to pry something off of her shoulder that she was holding onto." When he started running, Mr. Plascencia chased him. He saw the fugitive cross the parking lot, jump over a wall, run around a building, and get into a four door black Honda Accord. He also reached the car and bent the car's license plate toward him for a better look, repeating the number to himself. The number he gave police was 4XVU314. He told them he was confused as to the first digit, which could be a 3. Records of the Department of Motor Vehicles, admitted in evidence, showed that there was no record on file for plate number 4VXU314, that 3VXU314 is registered to a Trung Tran, and that 2VXU317, as noted above, is assigned to defendant's black Honda Accord.
>
> Mr. Plascencia also saw the robber's face. He identified defendant as the robber in a photographic lineup and again at trial.
>
> Defendant was charged by information with two counts of robbery. Two prior strike convictions were charged under Penal Code sections 667, subdivisions (b) through (I) and 1170.12; two prior convictions were charged under Penal Code section 667, subdivision (a); one prior conviction was charged under Penal Code section 667.5, subdivision (a); and five prior convictions were charged under Penal Code section 667.5, subdivision (b). After certain delays caused by the prosecutor's disqualification of one judge and by questions about defendant's competency to stand trial, the matter came on for jury trial, but was continued when defendant waived a jury under circumstances described more fully in part II, *post*. In the continued trial the court found defendant guilty on both counts and sustained all allegations of prior convictions. It denied defendant's motion to dismiss one or both of the strike priors and sentenced him to two consecutive terms of 25 years to life, plus a determinate term of 25 years, for a total sentence of 50 years to life consecutive to 25 years.

People v. Rogers, 2006 WL 2699041, at *1-4 (Cal. Ct. App. Sep. 21, 2006).

## DISCUSSION

I. Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams (Terry) v. Taylor, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry), 529 U.S. at 412-13. "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. Id. at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340.

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. See Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).

II. Claims

Petitioner raises two claims for relief under § 2254: (1) one of the two robberies is not supported by sufficient evidence, and (2) the court erred in accepting petitioner's waiver of his right to jury trial and in refusing to allow him to withdraw the waiver.

A. Sufficiency of the Evidence

Petitioner claims that the evidence introduced at trial was insufficient to sustain his conviction for the Milpitas robbery. The claim is without merit.

Federal habeas corpus relief is available to a prisoner who claims that the evidence was insufficient to support his state conviction only where, considering the trial record in the light most favorable to the prosecution,"no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). This standard is applied with reference to the substantive elements of the criminal offense as defined by state law. Id. at 324 n.16; Sarausad v. Porter, 479 F.3d 671, 678-79 (9th Cir. 2007).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations. Id. at 957-58.

After 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision reflected an "unreasonable application of" Jackson to the facts of the case. Id. at 1275.

The California Court of Appeal rejected petitioner's claim that the evidence at trial was constitutionally insufficient to support a finding beyond a reasonable doubt that petitioner was guilty of the charge in count 1, the robbery of Maria Larios on April 10, 2004 at the Bank of America in Milpitas. The court explained:

> As defendant correctly notes, the case against him on count 1 was far from open-and-shut, mainly because there was no direct evidence identifying him as the robber, and some evidence tending to show, if credited, that he was *not* the robber. The victim, Maria Larios, testified that the robber was a young Afro American man, between 20 and 30 years old, wearing a white sweater, Levi pants, and what she initially described as "a red beanie with a white letter." She could not estimate his height or weight. She testified that if she saw the robber again, she would try to identify him, but was not sure she could. Asked whether she saw the man who robbed her in court, she testified, "No, it's not him." However, she also testified that a red Montreal Expos baseball cap taken from defendant's residence looked like the hat the robber wore.
>
> Yahayra Cruz testified that the robber wore blue jeans, a white sweatshirt, and a red hat with the letter M or N. The hat in evidence looked more or less like robber's hat, she said; on a scale of 1 to 10, her certainty was about 8 that the exhibit looked like the robber's hat. She thought the lettering was "not exactly" like that what she remembered, but she did remember that the lettering was white and blue, as was the lettering on the hat in evidence. She testified that if she saw the robber again, she would not "exactly" be able to identify him.
>
> Christopher Olague-Garcia testified that the robber was probably 5 feet 10 inches to 6 feet 2 inches tall, African American, with light skin and "a big lower lip." Mr. Olague-Garcia saw the robber's face but didn't remember it. He thought he would be able to identify the robber if he saw him again. He did not see the robber in courtroom. The robber was wearing a red hat with the letter M. It was a fitted cap, not adjustable. It resembled the hat in evidence in this respect and in color. However, the hat in evidence had a bumpy texture and the robber's hat was smooth. In his opinion, the hat in evidence was not the robber's hat. The prosecutor properly conceded in his argument below that the evidence just recited, standing alone, would not be sufficient by itself

to support a finding beyond a reasonable doubt that defendant was the robber. None of the three eyewitnesses identified defendant as the perpetrator, and two of them could be understood to testify that he was *not* the perpetrator. All three of them thought defendant's Montreal Expos cap resembled the headgear worn by the robber, but one of them thought it was not the same hat. Standing alone, this testimony simply would not permit a rational factfinder to determine that defendant was the robber.

The evidence did not, however, stand alone. The robbery was also surrounded by a tapestry of circumstantial evidence that strongly pointed to defendant as the robber. Counting Milpitas, the court heard evidence of seven robberies, one resulting in defendant's conviction five years earlier and six within a two-month period beginning February 17, 2004. In each of the robberies but Milpitas, defendant was identified as the perpetrator by eyewitness identification, links to defendant's or his wife's car, or both. All of the robberies were perpetrated against female victims approaching a bank bearing a deposit bag. All of the robberies took place at branches of the same bank-a bank that apparently issued distinctively colored and marked deposit bags to its business account holders. All but two of the deposit bags bore these distinctive marks and colors, minimizing any doubt about their contents. All of the robberies were committed in the morning or early afternoon.

In four of the robberies, including Milpitas, the robber positioned himself near the bank entrance and engaged in some seemingly innocuous activity for the evident purpose of putting his target at ease. In one case (the last), he feigned interest in buying candy from a youthful vendor near the entrance. In two others, including Milpitas, he appeared to be talking on the phone until he suddenly grabbed the deposit bag from the victim. Two of the robberies, including Milpitas, were committed right at the bank door. In all of the robberies but the first, the robber escaped the immediate vicinity of the robbery by running, not driving. This fact could be reasonably viewed as be a response to the one exception, Dublin, where defendant was apparently captured and convicted precisely *because* he had parked his getaway car at the scene of the crime, enabling a third party to phone in his license number while he was stuck in traffic.

Further, as the trial court observed, the locations of the robberies made up a distinctive geographic pattern centering on defendant's Fremont home. The prosecutor described the pattern as spokes of a wheel, but it would be more accurate to describe it as an angular S or mirror-image Z. The 1999 Dublin robbery marks the right end of the upper arm; almost due west of this point, the first of the 2004 robberies, Castro Valley, marks the northern point of a nearly straight line running south-southeast to the penultimate robbery in Milpitas, where the pattern turns sharply west to Sunnyvale, completing the figure. Defendant's home sat in the middle of the main, diagonal leg, between the Union City robbery and the Fremont robbery. The Milpitas robbery, which is the subject of defendant's evidentiary challenge, falls squarely

within this pattern, and indeed provides the pivot point linking the preceding robberies to the final robbery in Sunnyvale. It bears emphasis that these locations do not simply mark a geometric figure, but one that was drawn, as it were, in chronological sequence, beginning at the top and proceeding to the bottom, like a pen on paper.

Defendant cites cases to the effect that the commission of other similar offenses can only establish the identity of the perpetrator of a charged offense if the similarities are " 'so unusual and distinctive as to be like a signature.' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403, quoting 1 McCormick on Evidence (4th ed.1992) § 190, ¶. 801-803; see *People v. Bean* (1988) 46 Cal.3d 919, 937.) Defendant does not dispute that the crimes here satisfied this test for purposes of admissibility under Evidence Code section 1101. Instead he seems to contend that the common features of the crimes are not distinctive enough to counterbalance *the failure of the Milpitas eyewitnesses* to identify him as the robber. But we are aware of no categorical rule that requires acquittal when the eyewitnesses to a crime testify that the defendant does not match their memory of the perpetrator. Where other evidence strongly supports an inference that the defendant is the culprit, the failure of eyewitnesses to recognize him is simply a factor for the trier of fact to weigh. After all, " 'the vagaries of eyewitness identification are well known....' "(*People v. McDonald* (1984) 37 Cal.3d 351, 363, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914, quoting *United States v. Wade* (1967) 388 U.S. 218, 228; see CALJIC No. 2.92.)

The trial judge, sitting as trier of fact, was entitled to conclude that the eyewitnesses were simply in error in view of the facts inculpating defendant, i.e., that someone closely resembling him, and wearing a distinctive hat similar to his, committed a robbery using his distinctive methods, and chose to do so at a time and place fitting perfectly in a sequence of similar robberies perpetrated by him.

Nor was the court obliged to take the testimony of the eyewitnesses here at face value. Two of them testified implausibly that the robber delivered a paralyzing "pinch" to the victim. (See discussion, *post.*) The third, Mr. Olague-Garcia, conceded early in his testimony that he saw the robber's face, but did not remember it. His opinion that the baseball cap in evidence was not the cap worn by the robber could also be rationally viewed as a product or misperception or misrecollection. He did not testify that he remembered a distinctive feature that was missing from the cap in evidence. Rather he noticed a feature in the latter-a bumpy texture-that he had not seen in the robber's hat. A factfinder could rationally conclude that he overlooked this apparently subtle feature in the heat of the moment, notwithstanding his testimony that he was concentrating on the robber's headgear as the most visible element of his appearance. The chase, after all, was brief, ending when Ms. Larios called to Mr. Olague-Garcia to desist for his own protection.

Defendant points to two "very significant differences" that he contends "distinguish the Milpitas case" from the other six robberies in evidence.

The first is that “the female victim was alone in every other case while in Milpitas she was with two other people....” It is true that none of the other victims was shown to be accompanied by other people while approaching the bank. However it cannot be said that all of the other victims were truly “alone.” The 1999 Dublin robbery was witnessed by another bank customer while sitting in her car, apparently in the bank's parking lot. More tellingly, the Sunnyvale robbery, which occurred one week after Milpitas, was perpetrated in the plain view of both Josiah Greer, who was selling candy 10 feet away, and Hector Plascencia, who was using an ATM 20 feet away. Whether this reflected growing carelessness, increased desperation, or declining luck on defendant's part, it clearly demonstrated that he would not be deterred by the mere presence of third parties.

Defendant's second “very significant difference[ ]” is that the Milpitas robber “pinched Larios to get the bag away, an act that was unlike anything that occurred in any other robbery.” This testimony was indeed unique, but it was also somewhat difficult to credit. The victim, Ms. Larios, testified that as her coworker opened the door, defendant stepped in front of her and stopped her, whereupon “I felt something weird, like my legs got paralyzed. I was totally paralyzed. I couldn't move. That's when he grabbed the envelope and ran away.” This feeling of paralysis was associated with a “stabbing” sensation to the left side of her neck. It felt like the robber “punched [her] with a needle or something very sharp, ... but [she] didn't have any marks or anything.” She also described it as a “pinch” that seemingly rendered her unable to move. One of her coworkers, Ms. Cruz, testified that she also saw the robber “pinch” Ms. Larios, who did not shout out in pain, but “was just paralyzed for that moment.” The other, Mr. Olague-Garcia, testified that he saw the robber “doing something” with his right hand while reaching for the deposit bag with his left. He believed the robber “must have touched her like probably in the neck or shoulder or something. . . .”

According to defendant, this testimony establishes that the Milpitas robber used “more force than occurred in any of the other crimes.” A factfinder might have reached that conclusion if it believed that the robber in fact applied some kind of immobilizing “pinch” to the victim. However, a rational factfinder would not be obliged to credit this testimony. We are aware of no real-world technique for temporarily “paralyzing” a person merely by pinching, or even punching or hitting, her neck. To the extent one of the victim's coworkers corroborated this supposed event, a factfinder could reasonably infer that their accounts had infected one another by way of the conversations they would naturally be expected to have about the robbery. A factfinder could quite reasonably infer that the “force” witnessed by them consisted at most of holding the victim at the neck while relieving her of the deposit bag. This would resemble the testimony of Castro Valley victim Carolyn Vane that defendant grabbed her shirt with one hand, incidentally ripping off her employee badge. She believed he was holding her with that hand so she wouldn't fall, while he grabbed the deposit bag with his other hand. A factfinder could quite reasonably

determine that the Milpitas robbery involved no more force than this.

Defendant also asserts that, in contrast to the other victims, the Milpitas victim "was accosted as she entered the bank doors rather than on the approach to the doors. . . ." But several other victims were robbed while opening, or on the verge of opening, the bank doors. Suman Goyal, the victim of the Union City robbery, testified, "As soon as I go in the bank, I tried to open the door, one person came from behind and snatched the bag and ran away." Carolyn Vane, the Castro Valley victim, testified that defendant walked immediately ahead of her to the door, where he stopped as if to open it for her, then turned, grabbed her, and snatched the deposit bags. Paulette Tran, the Fremont victim, was "[a]bout 10 feet from the bank" when defendant ran up and grabbed her deposit. The fact that the Milpitas victim was actually stepping through the door, instead of approaching it, suggests an accident of timing, not a distinguishing characteristic in the method of commission.

Defendant states that in Milpitas, "unlike in the other cases, no one saw the perpetrator . . . get into a car, but only saw him run off on foot." On the contrary, two other robberies resembled Milpitas in this respect. Carolyn Vane (Castro Valley) only saw the robber run out of the bank's parking lot, "into the next parking lot and beyond that to the street, and that's where I lost sight of him." Catherine Travis (Hayward) "chased him a little way but I knew I couldn't catch him so I just wanted to remember what he was wearing so I could tell the police." In neither of those cases did anyone testify that defendant was seen getting into a car. Indeed, of the seven victims, only Paulette Tran (Fremont) managed to chase the robber far enough to see him get into a car. In every other case where a car was seen, it was seen by a third party who chased the robber after witnessing the robbery or hearing a hue and cry by the victim. In any event, the point urged by defendant is largely or entirely irrelevant. It does not suggest a distinction in the mode of commission of the Milpitas robbery but at most reflects a logical consequence of the absence of a witness who saw the robber complete his getaway.

We agree with defendant that a witness's affirmative testimony that a defendant is not the perpetrator of a charged offense must be taken seriously in assessing the sufficiency of the evidence to support a conviction. It is not, however, conclusive, and it does not prohibit a factfinder from determining beyond a reasonable doubt that the defendant is indeed the perpetrator. Here it would have required an astonishing, Ripley's-Believe-It-Or-Not series of coincidences for defendant not to have been the Milpitas robber. Another person would have had to appear who looked like defendant, had a hat like his, used his distinctive method to commit the robbery, and chose a time and location fitting perfectly into the pattern of defendant's other offenses. While the court would certainly have been entitled to entertain a reasonable doubt about defendant's guilt, it was not obligated to do so.

People v. Rogers, 2006 WL 2699041, at **4-8 (Cal. Ct. App. 2006).

The California Court of Appeal's rejection of petitioner's insufficient evidence claim was not an unreasonable application of Jackson to the facts of the case. See 28 U.S.C. § 2254(d); Juan H., 408 F.3d at 1275. Viewing the evidence in the light most favorable to the prosecution, it cannot be said that no rational trier of fact could have found proof of guilt beyond a reasonable doubt that petitioner was the robber in the Milpitas bank robbery. See Jackson, 443 U.S. at 324.

The California Court of Appeal reasonably concluded that the trier of fact could rationally reject the Milpitas robbery witnesses' testimony suggesting that petitioner was not the perpetrator of the Milpitas robbery in view of the tapestry of circumstantial evidence that strongly pointed to petitioner as the robber. Contrary to petitioner's protestations, the circumstantial evidence presented at trial was more than sufficient to sustain his conviction for the Milpitas robbery. See Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (circumstantial evidence and inferences drawn from that evidence are sufficient to sustain a conviction). As the state court of appeal put it, "it would have required an astonishing, Ripley's-Believe-It-Or-Not series of coincidences for [petitioner] not to have been the Milpitas robber." Rogers, 2006 WL 2699041, at *8. On this record, there is no basis for this court to overturn the trier of fact's determination that the circumstantial evidence presented at trial was more credible than the Milpitas robbery witnesses' testimony. See Bruce, 376 F.3d at 957-58 (federal habeas court generally may not revisit credibility determinations). Petitioner is not entitled to federal habeas relief on his insufficient evidence claim. See 28 U.S.C. § 2254(d).

      B. Jury Trial Waiver

Petitioner claims that the trial court (1) failed to inform him fully of the rights he was waiving in waiving a jury trial, and (2) abused its discretion when it refused to allow him to withdraw his jury trial waiver without adequately inquiring into the reasoning for the request. The claims are without merit.

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . an impartial jury of the State and district where in the crime shall have been committed." But a criminal defendant may waive his right to trial by jury so long as the waiver is made knowingly and voluntarily. See Johnson v. Zerbst, 304 U.S. 458, 464-65 (1938). Such a waiver occurs where the defendant understands the significance of the decision and makes the decision free from coercion. See Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993); Adams v. Peterson, 968 F.2d 835, 837 n.1, 843-44 (9th Cir. 1992) (en banc).

Petitioner does not claim that his waiver of trial by jury was coerced or otherwise involuntary; rather, he claims, as he did unsuccessfully in state court, that he did not act knowingly and intelligently because he was not informed that a jury verdict must be unanimous. The claim is without merit because there is no clearly established Supreme Court decision holding that a jury trial waiver is invalid if the defendant is not informed that a jury verdict must be unanimous. See Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004) (if there is no Supreme Court precedent that controls on legal issue raised by petitioner in state court, federal habeas relief is unavailable because a state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law under § 2254(d)). In fact, the Supreme Court "has not held that the Constitution imposes a jury unanimity requirement," Richardson v. United States, 526 U.S. 813,

821 (1999), and at least one circuit has held that a waiver of trial by jury is not invalid simply because the defendant was not informed that a jury verdict of guilty must be unanimous, United States ex rel. Williams v. De Robertis, 715 F.2d 114, 1177 (7th Cir. 1983). Petitioner is not entitled to federal habeas relief on his invalid jury trial waiver claim. See 28 U.S.C. § 2254(d).

Nor is petitioner entitled to federal habeas relief on his claim that the trial court refused to allow him to withdraw his waiver without adequately inquiring into the reason for the request. The California Court of Appeal found that the trial court "inquired of counsel what were the grounds for the request, and counsel replied that [petitioner] had changed his mind." Rogers, 2006 WL 2699041, at *11. Petitioner submits no clear and convincing evidence to the contrary, or points to any Supreme Court decision holding that a represented defendant who knowingly and voluntarily waived his right to a jury trial has a constitutional right to withdraw his waiver simply because he changes his mind. See Stevenson, 384 F.3d at 1071.

The California Court of Appeal's rejection of petitioner's jury trial waiver claims was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court precedent, nor involved an unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

SO ORDERED.

DATED: April 3, 2009

CHARLES R. BREYER
United States District Judge

G:\CRBALL\2007\4658\Rogers.DenyingHabeasCorpus.wpd